[No. 1526.]

## Nabe McAfee *v.* The State.

1. **Theft—Indictment—Variance.**—Article 425 of the Revised Code of Criminal Procedure provides that in alleging the name of the accused or other person necessary to be named in an indictment, it shall be sufficient to state one or more of the initials of the Christian name and the surname. Hence, though an indictment for theft alleged the property to be that of "H. Hailey," and the proof showed the name to be "Hiram K. Hailey," there was no material variance between the allegation and the proof.

2. **Same—Charge of the Court.**—A necessary element of theft is the fraudulent *taking* of property from the possession of the owner, or some one holding possession for him. A *taking* by the party accused is essential to his guilt of theft, and no other subsequent connection with the stolen property, whether in good or in bad faith, will of itself constitute theft; wherefore it was error to charge, in substance, that the jury was authorized to convict if they believed that when he purchased the alleged stolen property from another, the defendant knew that the person from whom he purchased had no title to the property, and no right to sell it.

3. **Same.—Possession of Property Recently Stolen** may be relied upon by the State to connect the defendant with the taking, but this possession may be accounted for by purchase, whether in good or bad faith. And a purchase in bad faith, though it would subject the accused to prosecution

for knowingly receiving stolen property, is matter defensive to a prosecution for theft of the property thus purchased with knowledge that the seller had stolen it.

4. SAME.—While the defendant's guilty knowledge of the seller's want of title becomes a grave question in the effort to meet proof of another's fraudulent taking by proof of his own purchase, he can not, by showing a sham purchase, whether in good or bad faith, excuse a fraudulent taking.

APPEAL from the District Court of Navarro.    Tried below before the Hon. L. D. Bradley.

The indictment charged the appellant and John Bassett with the theft of a cow, the property of H. Hailey, in Navarro county, on the twenty-fifth day of October, 1882.    Upon his separate trial the appellant was convicted, and was awarded a term of two years in the penitentiary.

Hiram Hailey testified, for the State, that on October 25, 1882, he was going from Corsicana home in his two horse wagon, his father and brother following a short distance behind in another wagon.    About three miles out from town, the witness met the defendant and John Bassett driving three head of cattle, including the animal in question.    The witness saw them before they saw him.    When defendant and Bassett saw the witness they stopped, and permitted the cattle to leave the road and go to a tank which lay toward the witness.    The defendant started off to a branch as though to water his horse.    The witness called Bassett and asked him what he and the defendant were doing with his cow, pointing to the animal.    Bassett replied that the defendant McAfee had bought the cow as one of the JD brand, and that he witnessed the bill of sale.    About that time the defendant came up and the witness asked him what he was doing with the cow, and he replied that he had bought her as an unbranded cow.    Witness asked: "Well, how is this; one of you claim to have bought her as an unbranded cow, and the other says you bought her as a JD cow."    Whereupon defendant and Bassett dropped their heads.

The witness knew his cow, and claimed her as soon as he saw her.    Defendant and Bassett denied that she belonged to the witness, and, though requested, refused to tell who they bought her from, or to show the bill of sale, saying they would do so at the proper time.    The witness told the parties that they had to drive the cow back to the place where they got her.    Bassett

offered to stand good for her delivery next day, but the witness replied to Bassett that he would not accept him as security. Presently Sam. Black rode up and offered to stand good for the animal, and the witness agreed. The defendant and Bassett said they would put the cow in Huskey's pasture near by, and take her next day to 'Squire Leetch's, where witness and they were to meet. The parties met at Leetch's next morning, but defendant and Bassett did not bring the cow. They said that no one but a small boy was at the pasture when they turned her in, the night before, and that Huskey turned her out that night.

The witness had purchased the animal from Pete Adams about eighteen months before, and milked her up to about four months before this time. Her color was red; her mark a swallowfork and underbit in the left and a crop off the right ear; her brand was the figures 7 and 6 connected, by giving the curl of a 6 to the down stroke or stem of a 7, making 76, and that brand on this cow was very plain. She was four years old when bought by witness. The defendant knew the few stock owned by the witness. He often passed the house of the witness while the witness was milking this cow. This animal came to Mr. Adams in the division of his father-in-law's estate, to which the 76 brand belonged. The mark belonging to that estate was a swallowfork and underbit in the left and a hole and two underbits in the right ear. The mark in which this cow was belonged to widow Newman, who gave the JD brand.

When the witness met the defendant as stated, he accused the defendant of running the cow on the Sunday previous, at which time she escaped into the witness's field. The defendant admitted the charge, and said that the cow did not belong to the witness. The witness had never seen the cow since he saw the defendant and Bassett driving her.

Frank Hailey, the brother of the previous witness, stated that he was with his brother when they met the defendant and Bassett, on October 25, 1882, with the cow and two other cattle, and otherwise testified substantially as did his brother. Sometime after the occurrences at that meeting, the witness's said brother got twenty-five dollars from Fred. Black, to hold until the cow was delivered.

Wid. Hailey, the father of the last two witnesses, testifying for the State, related the occurrences at the meeting of the parties, together with the cow, as they were related by his sons. He said, in addition, that, after the meeting of the parties at

'Squire Leetch's, he heard the defendant and Bassett admit that they believed the cow to be the property of Hiram Hailey. The names of the witness's sons were H. K. and E. F. Hailey. H. K. Hailey signed his name H. K. Hailey and E. F. signed his E. F. Hailey. H. in the name of the prosecutor stands for Hiram, K. for King.

M. Huskey testified, for the State, that he lived about three miles south of Corsicana, and owned a pasture there. No cattle were put into his pasture and none turned out in 1882, by the witness. He had no little boy. He had one near neighbor, and others not very far off. They all have pastures. The State closed.

Jack McAfee testified, for the defense, that he and the defendant were brothers. In October, 1882, a man named Williams drove a cow up to the house of the witness's mother, where the defendant and the witness lived. He inquired the way to Mr. W. A. Hancock's place. The cow was of a pale red color, about six years old; marked with a crop off the right and a swallowfork and underbit in the left ear, which was the mark of Mrs. Shones, then Mrs. Newman. The cow was not branded. The man Williams claimed the cow, saying that he had traded for her, and offered to sell her to the defendant, and did so, giving the defendant a bill of sale. The defendant wrote the bill of sale, Williams signed it, and the witness and John Bassett signed it as witnesses. The defendant signed Williams's name, and Williams made his mark. Witness and Bassett signed it at the request of Williams. The witness examined the cow at that time, but could see no brand on her.

After the trade spoken of, the cow was put into the lot and was there at sundown, but broke out that night, and the witness had never seen her since. When Williams brought the cow to the house the animal looked as though she had been run. Williams had lived in that neighborhood twice within the last several years. Witness had never seen Williams since. John Bassett, Clint Collins, John Bowman, witness and the defendant were present when Williams drove up with the cow. The witness knew one or two of Hailey's cows, and knew Williamson's (Adams's father-in-law) 76 brand. Williamson's mark was two underbits in the left, and an underbit and a notch out of the end of the right ear.

The defense then introduced in evidence the bill of sale, which reads as follows:

"The State of ⎱ The County ⎱ 1882.
     Texas. ⎰ of Navarro, s. s. ⎰

"Known all men by these presents that I the undersigned have this day bargain, sold and delivered to N. M. McAfee one pale red cow, about six years old, marked thus: (as stated by first witness) with no brand perceivable, which I will warrant and defend all titles.

"G. T. Williams, ×

"Witness J. T. Bassett, ×

" J. K. McAfee."

John Bowman testified, for the defense, that he was at Mrs. McAfee's in October, 1882, when Williams came there with a pale red cow, in the mark described by previous witnesses, and inquired directions to Hancock's. Williams claimed that he had traded for the cow, and that she was his property, and he finally sold her to the defendant, who, in the presence of the witness, paid him eighteen dollars for her. Williams drove the cow up quietly. The witness was at the gate when the bill of sale was written. It was his impression that Williams wrote it, though he was not certain. He could see into the house where the bill of sale was being written, but paid little or no particular attention to the matter. The witness could not write, and he did not write the bill of sale. He saw Williams make his mark to the bill of sale. He saw the cow put into the pen at McAfee's, and had not seen her since. The witness examined her and could find no brand on her. She was not branded. The witness had been a witness for the defendant in other cases. The matters testified to in regard to the cow occurred on the twelfth or thirteenth of October, 1882, before Hailey's cow was said to have been lost. The cow was quiet and did not appear to have been run. The witness did not know Williams, nor has he seen him since.

Clint Collins testified, for the defense, that he was at McAfee's when Williams brought the cow there in October, 1882. He saw the defendant write the bill of sale in the house after he brought the cow. The cow was a pale red animal in Mrs. Newman's mark, but was unbranded. He saw the cow in the lot that evening. He saw Williams on the prairie in the neighborhood a week before, and saw him several times during the previous spring. He did not know where Williams lived then or now.

Percy Collins testified, for the defense, that on the twelfth day

of October, 1882, he met a man on the road between Grice's and Black's, who asked if Hancock was at home. He was driving a pale red cow in Mrs. Newman's mark, but unbranded. The witness asked him his name and he said Williams. Witness passed the cow first. She turned around during the conversation, and thereby enabled witness to see that she was not branded on either side. McAfee's was distant a short piece, and was between Grice's and Hancock's. Witness had never seen the man Williams before.

Henry Swink testified, for the defense, that he had seen the cow two or three times, the last time about three miles from Corsicana, on the Pursely road. She was grazing with other cattle. This was in the fall of 1882. She was a pale red cow, in Mrs. Newman's mark, and was not branded. The witness first saw this animal, when she was a year or two old, on Tehuacana creek. She was then in the same mark. He next saw her on Alligator creek, near Hailey's. The cow was near a pasture when witness last saw her.

Fred Black testified that in November, 1882, his brother Sam told him to get twenty-five dollars from Mr. Jones and take it to K. H. Hailey; which the witness did.

Tom Black testified, for the defense, that in the fall of 1882 he saw the cow in question between Pecan and Cedar creeks. As he could see no brand, he roped and threw her down and examined for brands. She was not branded.

J. P. Hailey, in rebuttal, testified that he had a bill of sale on his books, dated February 14, 1883, signed by W. A. Hancock. The witness was not present when it was executed. He did not know whether or not it was correct, as he had never seen the cow. The witness's report, showing age, marks and brands of cattle bought and killed from January 1 to May 17, was made out by Mr. Killebrew, not present on this trial. Killebrew made it out from witness's books and bills of sales, but witness could not say that it was correct in all particulars. The report contains the following entry:

"1 cow, 4 years old (the Newman mark), branded 76 (connected), bill of sale by W. A. Hancock."

Hiram Hailey, recalled, disputed several matters testified to by the witnesses for the defense.

The motion for new trial was overruled.

*William Croft,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge.. Nabe McAfee was charged with the theft of a cow, the property of *H.* Hailey. Hailey swore that his name was Hiram, but it appeared from the evidence that the initials of his given name are K. H., making K. H. Hailey. Counsel for defendant urged below, and here insists, that this was a fatal variance.

To allege H. and prove Hiram would suffice. To allege Hiram, and prove that he was commonly known as Hiram would be sufficient, though Hiram be the middle name. But to allege H. and prove K. H., the H. standing for Hiram, presents quite a different case. Under the well settled rule "that a middle name or initial is not known in law, and is treated as of no consequence whatever," it would follow that to allege a middle name or middle initial only, would not be a basis for proof of any name; and that, when the evidence developed the fact that the middle name or initial had been charged in the indictment, the insufficiency of the indictment would appear, and the prosecution crumble under such an indictment. These observations have reference to the law as it stood prior to the revision.

By article 425 of the Code of Criminal Procedure, it is sufficient to state one or more of the initials of the Christian name, and the surname. This article settles the question against the defendant.

Defendant relied upon a purchase and bill of sale from another party. There was evidence in support of this defense. Upon this theory of the case, the learned judge charged the jury as follows: "3. If you believe from the evidence that the defendant in good faith purchased from one Williams said cow, and that he took and had possession of the same by reason of such purchase and the bill of sale introduced, although you may believe from the evidence that it had been stolen by the said Williams, you are instructed that such taking would not constitute theft, and in that case you will find the defendant not guilty, unless you believe from the evidence that defendant knew, at the time, that the said Williams· had no right or title to or ownership in said cow, or authority to sell the same."

Suppose that defendant took possession of the cow by reason of such purchase, what had good faith to do with this case?

Let us illustrate. A. steals a cow. B., with knowledge of the theft, buys the cow from A. Shall we say, *thereupon*, B. stole the cow? Again, A. steals a cow. B., with knowledge of the theft, buys from A. Are we not forced to say, *therefore*, B. did not steal the cow, this being the real fact of the case?

Theft is the fraudulent *taking* of property *from* the *possession* of the owner, or some one holding possession for him. *There must be a taking*, and no subsequent connection with the stolen property, be it in *good* or *bad* faith, honest or fraudulent, will constitute theft.

If the evidence fails to connect defendant with the *taking*, unless by recent possession, this recent possession may be accounted for by proof of purchase, whether in good or bad faith; and defendant may in *law* urge the purchase, notwithstanding he had full knowledge that the seller had stolen the property. It is true that this would be receiving property knowing that it had been stolen, for which the purchaser, under an indictment charging *this offense*, could be tried and convicted. But appellant in the case at bar was tried for and convicted of *theft*. It was this charge, this offense, he was called upon to meet, and no other; and he had the right to meet and defeat the charge of theft with any matter which would secure that purpose, although his guilt of another offense should be developed.

In the charge complained of, the jury are told that if defendant in good faith purchased the cow from Williams, and by virtue of said purchase took possession of the cow, they should find the defendant not guilty, "unless defendant knew at the time that Williams had no right or title to or ownership in the cow, or authority to sell the same." Now, the jury are not informed what they should do in the event they should find from the evidence that defendant *did* know that Williams had no right or title to or ownership in the cow, etc. But the inference of guilt of the theft of the cow from this charge is inevitable. And the jury could have drawn no other conclusion, if they believed defendant knew these facts, than the guilt of defendant.

If the defendant should attempt to meet the proof of a *fraudulent taking* with a purchase and bill of sale, his guilty knowledge of the seller's title or right to sell becomes of very great importance. He will not be permitted by a sham purchase, or by any character of purchase, whether in good faith or otherwise, to excuse the *fraudulent* taking.

But suppose that the jury should believe from the evidence

that the defendant *did not take* the cow, but purchased the same with full knowledge that Williams had stolen her, he certainly would not be guilty of *theft*. Hence, we conclude that if the defendant's connection with the cow was subsequent to the taking, he is not guilty of theft, whether this connection be fraudulent or in good faith. We are not discussing the question as to what is required to constitute a principal. See this subject exhaustively treated in *Cook* v. *The State, ante,* page 96.

We are of the opinion that the court erred in the charge discussed; and as this charge was excepted to, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 7, 1883.